UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

_____

WILLIAM HODGES,

                                Plaintiff,

v.                                                       9:10-CV-00531

                                                                    (GLS/TWD)

LESTER N. WRIGHT, M.D., M.P.H. Associate
Commissioner; MARIO DEAZEVEDO, M.D.;
JILL NORTHRUP, Nurse Administrator,

                                Defendants.

_____

APPEARANCES:                             OF COUNSEL:

WILLIAM HODGES
Plaintiff *pro se*
06-A-2600
Great Meadow Correctional Facility
Box 51
Comstock, New York 12821

HON. ERIC T. SCHNEIDERMAN           ADRIENNE J. KERWIN, ESQ.
Attorney General for the State of New York   Assistant Attorney General
Counsel for Defendant Northrup
The Capitol
Albany, New York 12224

THÉRÈSE WILEY DANCKS, United States Magistrate Judge

## REPORT- RECOMMENDATION AND ORDER

     This *pro se* prisoner civil rights action, commenced pursuant to 42 U.S.C. § 1983, has been referred to me for Report and Recommendation by the Honorable Gary L. Sharpe, Chief United States District Judge, pursuant to 28 U.S.C. § 636(b) and N.D.N.Y. L.R. 72.3(c).

     Plaintiff William Hodges alleges in his Second Amended Complaint that Defendant Jill

Northrup ("Northrup"), a nurse practitioner at Elmira Correctional Facility ("Elmira") and the only remaining defendant, denied him adequate medical care and treatment for a knee injury in violation of his rights under the Eighth Amendment. (Dkt. No. 37 at ¶¶ 27-30.) Currently pending before the Court is Defendant Northrup's motion for summary judgment pursuant to Federal Rule of Civil Procedure 56. (Dkt. No. 57.) Plaintiff has opposed the motion. (Dkt. No. 61.) For the reasons that follow, I recommend that Defendant's motion be granted.

I.      BACKGROUND

Plaintiff, who is currently incarcerated at Great Meadows Correctional Facility ("Great Meadows") injured his left knee on Saturday, August 16, 2008, while incarcerated at Elmira, when he slipped on wet paint and slammed his knee into the wall as he fell. (Dkt. No. 37 at ¶ 10; Dkt. No. 57-2 at 16-17.) Plaintiff returned to his cell with the assistance of another inmate and within an hour went to emergency sick call. (Dkt. No. 57-2 at 17, 20-21.) Plaintiff was seen by a nurse. *Id*. at 21. Plaintiff recalls that by the time the nurse examined him, he could not bend his knee and it had swollen to grapefruit size. *Id*. at 18. According to Plaintiff's medical records, his left knee was swollen with palpable fluid over the knee, he was able to bend it approximately forty-five degrees, and no ecchymosis was noted. (Dkt. No. 57-3 at ¶ 3.) The nurse looked at Plaintiff's knee and gave him ice and nonsteroidal anti-inflammatory drug ibuprofen.[1] (Dkt. No. 57-2 at 23-24.) Plaintiff was given a call-out slip for a medical appointment two days later. *Id*.

At the time he hurt his knee, Plaintiff was taking the pain medication Fioricet for shoulder pain. *Id*. at 20. When the ibuprofen given to Plaintiff by the nurse ran out either late on August 16, 2008, or early the next day, Plaintiff began taking the Fioricet for his knee pain. *Id*. at 30-31.

---

[1] Ibuprofen and Motrin, a brand of ibuprofen, are used interchangeably herein.

2

He claims that neither ibuprofen nor Fioricet relieved the pain. *Id*. When he asked a corrections officer to let him go to sick call so he could get different medication over the weekend, the officer told him that nothing could be done and he had a call-out for Monday. *Id*. at 25.

According to Defendant, at sick call at Elmira, inmates are initially seen by nurses who perform triage and report their findings to the physician on duty. (Dkt. No. 57-3 at ¶ 5.) Inmates are often not seen directly by physicians for common injuries because the nurses are able to triage. *Id*. When Plaintiff went to his medical appointment on August 18, 2008, a nurse looked at Plaintiff's knee. (Dkt. No, 57-2 at 28.) Plaintiff's medical records show that on August 18th his knee was grossly edematous, with ecchymosis noted below the knee. (Dkt. No. 58 at 37;[2] Dkt. No. 57-3 at ¶ 4.) Plaintiff's knee was wrapped in an Ace bandage, and he was given crutches, both ordered by Defendant. (Dkt. No. 57-2 at 28; Dkt. No. 57-3 at ¶ 4.) An x-ray, also ordered by Defendant, was taken of Plaintiff's left knee. (Dkt. No. 57-2 at 28-29; Dkt. No. 58 at 47.) Defendant did not personally examine Plaintiff's knee on August 18th, or at any other time. (Dkt. 57-2 at 27; Dkt. No. 57-3.)

The x-ray showed "mild degenerative changes in the medial compartment of Plaintiff's knee, with no fracture, dislocation or joint effusion. It also showed small areas of tendon calcification with no other abnormality seen. Plaintiff's August 18, 2008 x-ray did not show a tendon rupture . . . . Nothing in plaintiff's August 18, 2008 x-ray indicated that the plaintiff suffered from anything more than a mild contusion."[3] (Dkt. No. 57-3 at ¶¶ 6 and 10; Dkt. No. 58

---

[2] Copies of Plaintiff's medical records, submitted by Defendant in support of her motion, have been duly certified and authenticated by affidavit. (Dkt. No. 58 at 2.)

[3] The x-ray report bears the electronic signature of Radiologist Daniel Nattell, M.D. (Dkt. No. 58 at 47.)

at 47.) In Defendant's professional medical judgment, Plaintiff's complaints as of August 18, 2008, did not indicate he had suffered a ruptured tendon because he was still able to move his knee well. *Id*. at ¶ 11. Further, in her professional judgment, "the ace bandage, crutches, and Motrin given to plaintiff on August 18, 2008, were the appropriate treatments, and in accordance with the standard of care, for treating the symptoms displayed and complained of, by the plaintiff on August 18, 2008." *Id*. at ¶ 12. Defendant acknowledged that if the conservative treatment she deemed appropriate for soft tissue knee injuries was not effective, further testing and treatment could be necessary. *Id*. at ¶ 13.

Plaintiff was concerned about not seeing a physician on August 18, 2008, because he was in pain and the medication that had been issued to him — ibuprofen and Fioricet — was not working.[4] (Dkt. No. 57-2 at 30.) Plaintiff's health progress notes reveal that two days later, on August 20, 2008, his Fioricet was taken from him because another inmate, who had tested positive for barbiturates, reported receiving Fioricet from Plaintiff. (Dkt. No. 58 at 36; *see also* Dkt. No. 57-2 at 37-38.) The health record progress note for August 20, 2008, indicates that Plaintiff was authorized to take over-the-counter Motrin or Tylenol. *Id*.

On September 11, 2008, prior to his transfer to Upstate Correctional Facility ("Upstate"), Plaintiff was placed in the Special Housing Unit ("SHU") when his urine tested positive for marijuana. (Dkt. No. 57-2 at 33-34, 40.) Plaintiff spoke with a nurse in sick call while he was in SHU and told her that his Fioricet had been confiscated and he needed pain medication. *Id*. at

---

[4] At one point in his deposition, Plaintiff testified that he told the nurse he saw on August 18th that the pain medication he was taking was not working and got no response. (Dkt. No. 57-2 at 25.) At another point, Plaintiff testified that he did not think he had complained to the nurse about the medication not working. *Id*. at 31.

4

37-39. He was told that ibuprofen was all they could offer him.[5] *Id.* at 39.

After Plaintiff was transferred to Upstate, he was placed on nonsteroidal anti-inflammatory drug Naprosyn by Dr. DeAzevedo (DeAzevedo"), who saw Plaintiff once and diagnosed him as having arthritis in his left knee. (Dkt. No. 57-2 at 49-50; Dkt. No. 58 at 35.) According to Plaintiff, the Naprosyn did not help with his pain. (Dkt. No. 57-2 at 50.) Following his transfer to Great Meadow, Plaintiff saw Dr. Karandy in February of 2009. *Id.* at 61-62. Dr. Karandy referred Plaintiff to an Orthopedic surgeon and a physical therapist, both of whom concluded that Plaintiff had a torn patellar tendon in his left knee. *Id.* at 64-67; (Dkt. No. 58 at 100.) Plaintiff ultimately had two surgical procedures to repair the tendon and continues to have problems with the knee. *Id.* at 68, 77-78; (Dkt. No. 57-2 at 85; Dkt. No. 58 at 63-64, 102-103.)

## II. PROCEDURAL HISTORY

Plaintiff initially brought this action against Defendants Jane Doe/John Doe, M.D., DeAzevedo, Nurse Administrator Nancy Smith ("Smith"), Nurse Administrator Janet Collins

---

[5] After speaking with the nurse in sick call, Plaintiff filed Grievance No. EL-34-798-08 on September 6, 2008. (Dkt. No. 57-2 at 36-37; Dkt. No. 57-2 at 119.) Plaintiff complained that he had not seen a doctor for his knee and asked that his knee be looked at by a doctor and that he be sent out for an MRI if deemed necessary. (Dkt. No. 57-2 at 119.) The IGRC noted that Plaintiff had received some medical attention and that his knee was x-rayed, and advised Plaintiff to pursue treatment at Upstate to which he had been transferred. *Id.* at 120. The Superintendent concluded that it appeared Plaintiff's medical needs had been met. *Id.* Both the IGRC and the Superintendent made reference to Plaintiff being referred for knee injections, which based upon the evidence in the summary judgment record does not appear to have been the case. In its December 3, 2008 ruling on Plaintiff's appeal, the Central Office Review Committee concluded that Plaintiff had received appropriate care for his left knee and had not presented sufficient evidence to substantiate any malfeasance by the staff, noting that: "[o]n 8/18/08, [Plaintiff] had x-rays, was issued crutches and had his left knee wrapped in an ace bandage. On 8/20/08, his Fioricet was discontinued and ibuprofen was issued." *Id.* at 116.

5

("Collins"), and Dr. Lester N. Wright ("Wright"), Associate Commissioner. (Dkt. No. 1 at 1.) In a Decision and Order filed on June 7, 2010, Federal Magistrate Judge George H. Lowe[6], granted Plaintiff's motion to proceed *in forma pauperis* and denied his motion for appointment of counsel, with leave to file another motion for appointment of counsel in the event Plaintiff could demonstrate specific changed circumstances warranting the granting of such an application. (Dkt. No. 7.)

Judge Lowe subsequently granted Plaintiff leave to file an amended complaint and directed that Defendant Northrup be substituted for Jane/John Doe, M.D. (Dkt. Nos. 18 and 19.) Defendants Wright, DeAzevedo, Smith, Collins, and Northrup moved to dismiss Plaintiff's Amended Complaint for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6). (Dkt. No. 22.) Judge Lowe recommended dismissal of Plaintiff's Amended Complaint, in which he had asserted claims under 42 U.S.C. § 1983 for violation of his rights under the Eighth and Fourteenth Amendments; Title II of the Americans with Disabilities Act of 1990, 42 U.S.C. §§ 1231 *et seq*. and the Rehabilitation Act of 1973, 29 U.S.C. § 794; and the New York Public Health Law ("NYSPHL") § 2803-c. (Dkt. No. 30.) Judge Lowe also recommended that Plaintiff be granted leave to amend his already amended complaint, except for his NYSPHL claim. *Id*. at 19. Judge Sharpe adopted Judge Lowe's Report and Recommendation in its entirety and granted Plaintiff leave to file a second amended complaint. (Dkt. No. 34.)

Plaintiff filed his Second Amended Complaint on January 24, 2012, and Judge Lowe

---

[6] The case was reassigned to me upon Judge Lowe's retirement in February of 2012. (Dkt. No. 39.)

6

issued an Order accepting the Second Amended Complaint as the controlling complaint in this suit.[7] (Dkt. No. 37.) Defendants Wright, DeAzevedo, and Northrup filed a Rule 12(b)(6) motion to dismiss the Second Amended Complaint. (Dkt. No. 40.) Judge Sharpe granted the motion to dismiss as to Defendants Wright and DeAzevedo but denied it as to Defendant Northrup, finding that Plaintiff had stated an Eighth Amendment claim arising out of inadequate medical care against her by alleging that she had misdiagnosed his knee injury, failed to examine his knee after x-rays revealed "degenerative changes from his injury," and failed to issue him "medication to constitute any form of treatment for the pain and suffering he was experiencing." (Dkt. No. 43 at 8, quoting Dkt. No. 37 at ¶ 13.)

Discovery ensued, and Defendant Northrup now moves for summary judgment dismissing Plaintiff's Eighth Amendment claim against her. (Dkt. No. 57.)

## III. APPLICABLE LEGAL STANDARDS

Summary judgment may be granted only if the submissions of the parties taken together "show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). The party moving for summary judgment bears the initial burden of showing, through the production of admissible evidence, that no genuine issue of material fact exists. *Salahuddin v. Goord*, 467 F.3d 263, 272-73 (2d Cir. 2006). A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

---

[7] Plaintiff did not name Collins or Smith as Defendants in his Second Amended Complaint. (Dkt. No. 37 at 1-2.)

Only after the moving party has met this burden is the nonmoving party required to produce evidence demonstrating that genuine issues of material fact exist. *Salahuddin*, 467 F.3d at 272-73. The nonmoving party must do more than "rest upon the mere allegations . . . of the [plaintiff's] pleading" or "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986). "Conclusory allegations, conjecture and speculation . . . are insufficient to create a genuine issue of fact. *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998).

In determining whether a genuine issue of material fact exists, the court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 309 (2d Cir. 2008). Where a party is proceeding *pro se*, the court is obliged to "read [the *pro se* party's] supporting papers liberally, and . . . interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994). However, "a *pro se* party's 'bald assertion,' unsupported by evidence, is not sufficient to overcome a motion for summary judgment." *Cole v. Artuz*, No. 93 Civ. 5981 (WHP) (JCF), 1999 WL 983876 at *3, 1999 U.S. Dist. LEXIS 16767 at *8 (S.D.N.Y. Oct. 28, 1999)[8] (citing *Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991)).

## IV.     ANALYSIS

The Eighth Amendment to the United States Constitution prohibits "cruel and unusual" punishment. The word "punishment" refers not only to deprivations imposed as a sanction for criminal wrongdoing, but also to deprivations suffered during imprisonment. *Estelle v. Gamble*, 429 U.S. 97, 102-03 (1976). Punishment is "cruel and unusual" if it involves the unnecessary

---

[8] Copies of unpublished decisions cited herein will be provided to Plaintiff by the Clerk.

and wanton infliction of pain or if it is incompatible with "the evolving standards of decency that mark the progress of a maturing society." *Estelle*, 429 U.S. at 102 (quoting *Trop v. Dulles*, 356 U.S. 86, 101 (1958)). Thus, the Eighth Amendment imposes on jail officials the duty to "provide humane conditions of confinement" for prisoners. *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (citation omitted). In fulfilling this duty, prison officials must ensure, among other things, that inmates receive adequate medical care. *Id.* (citing *Hudson v. Palmer*, 468 U.S. 517, 526-27 (1984)).

There are two elements to a prisoner's claim that prison officials violated his or her Eighth Amendment right to receive medical care: "the plaintiff must show that she or he had a serious medical condition and that it was met with deliberate indifference." *Caiozzo v. Koreman*, 581 F.3d 63, 72 (2d Cir. 2009) (citation and punctuation omitted). "The objective 'medical need' element measures the severity of the alleged deprivation, while the subjective 'deliberate indifference' element ensures that the defendant prison official acted with a sufficiently culpable state of mind." *Smith v. Carpenter*, 316 F.3d 178, 183-84 (2d Cir. 2003).

A "serious medical condition" is "a condition of urgency, one that may produce death, degeneration, or extreme pain." *Nance v. Kelly,* 912 F.2d 605, 607 (2d Cir. 1990) (Pratt, J. dissenting) (citations omitted), *accord*, *Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994); *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998). There is no bright-line test to measure the seriousness of a prisoner's medical condition. *Stevens v. Goord*, 535 F. Supp. 2d 373, 383 (S.D.N.Y. 2008). However, the Second Circuit has set forth factors to consider when determining whether an alleged medical condition is sufficiently serious, including but not limited to: (1) the existence of an injury that a reasonable doctor or patient would find important

9

and worthy of comment or treatment; (2) the presence of a medical condition that significantly affects an individual's daily activities; and (3) the existence of chronic and substantial pain. *Chance,* 143 F.3d at 702. Inquiry into whether a plaintiff had a serious medical need "must be tailored to the specific circumstances of each case." *Smith,* 316 F.3d at 185.

Medical mistreatment rises to the level of deliberate indifference only when it "involves culpable recklessness, *i.e.*, an act or a failure to act . . . that evinces 'a conscious disregard of a substantial risk of serious harm.'" *Chance*, 143 F.3d at 703 (quoting *Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir. 1996 )). Thus, to establish deliberate indifference, an inmate must prove that (1) a prison medical care provider was aware of facts from which the inference could be drawn that the inmate had a serious medical need; and (2) the medical care provider actually drew that inference. *Farmer*, 511 U.S. at 837; *Chance*, 143 F.3d at 702-03. The inmate then must establish that the provider consciously and intentionally disregarded or ignored that serious medical need. *See Farmer*, 511 U.S. at 825; *Ross v. Giambruno*, 112 F.3d 505 (2d Cir. 1997). An "inadvertent failure to provide adequate medical care cannot be said to constitute 'an unnecessary and wanton infliction of pain' . . . . Thus, a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner." *Estelle*, 429 U.S. at 105-6.

In support of her claim that Plaintiff did not suffer from a serious medical condition for Eighth Amendment purposes, Defendant has cited a number of decisions, all distinguishable, in which knee problems were found not to be serious medical conditions. *See, e.g.*, *Johnson v. Wright*, 477 F. Supp. 2d 572, 575 (W.D.N.Y. 2007), *aff'd*, 324 F. App'x 144 (2d Cir. 2009) (torn

10

meniscus); *Espinal v. Coughlin*, No. 98 Civ. 2579 (RPP), 2002 WL 10450, at * 4, 2002 U.S. Dist. LEXIS 20, at * 11 (S.D.N.Y. Jan. 2, 2002) (ruptured anterior cruciate ligament ("ACL")); *Lowman v. Perlman*, No. 9:06-CV-422 (LEK/RFT), 2008 WL 4104554, at * 5, 2002 U.S. Dist. LEXIS 112524, at * 12-13 (N.D.N.Y. Aug. 29), aff'd, 415 F. App'x 313 (2d Cir. 2011), 2008) (possible small ACL tear). I find that there is sufficient medical evidence in this case for a reasonable jury to conclude that Plaintiff had a serious medical condition for purposes of satisfying the objective element of Plaintiff's Eighth Amendment claim. *See Johnson v. Stempler*, No. Civ.A. 00-711, 2005 WL 119575, at * 3, 2005 U.S. Dist. LEXIS 765, at * 11 (E.D. Pa. Jan. 20, 2005) (jury could reasonably determine that an initially misdiagnosed torn patellar tendon requiring a surgical repair and leaving plaintiff with a permanent loss of knee function and range constituted a serious medical condition), *aff'd*, 373 F. App'x 151 (3d Cir. 2010).

Although the initial x-ray of Plaintiff's left knee did not show a serious injury from his fall, he was diagnosed with a torn patellar tendon some eight months later and found to need surgery. (Dkt. No. 58 at 100.) Despite two surgeries to repair the tear, Plaintiff has continued to have knee problems, and Plaintiff claims to have been told by Dr. Karandy in the latter part of 2012 that his kneecap has become permanently dislocated. (Dkt. No. 57-2 at 93.) Further, Plaintiff complained of severe knee pain over a long period of time as a result of the injury sustained in the fall at Elmira.

Nonetheless, because the evidence presented by the parties establishes as a matter of law that Defendant did not act with deliberate indifference, she is entitled to summary judgment despite the Court's finding that Plaintiff had a serious medical condition. *See Caiozzo,* 581 F.3d at 72 (plaintiff must show both a serious medical condition and deliberate indifference to prevail

11

on an Eighth Amendment claim for inadequate medical care). Defendant ordered an x-ray of Plaintiff's knee when examination by the nurse two days after the injury was sustained showed that Plaintiff's knee was grossly edematous, with ecchymosis. (Dkt. No. 58 at 37.) The Radiologist's report on the x-ray showed only mild degenerative changes, no tendon rupture or other major injury from the fall. (Dkt. No. 57-2 at ¶ 2; Dkt. No. 57-3 at ¶ 6; Dkt. No. 58 at 47.) The report did not reveal a serious medical need and provided Defendant with no basis to infer that Plaintiff had a serious medical need. *See Chance*, 143 F.3d at 702-03 (showing of deliberate indifference requires proof of awareness of facts from which an inference could be drawn that inmate had a serious medical condition).

Defendant ordered that Plaintiff be given an Ace bandage, crutches, and Motrin which, in her professional medical judgment, were the appropriate treatments and were in accordance with the standard of care for treating the symptoms displayed and complained of by Plaintiff on August 18, 2008. (Dkt. No. 57-3 at ¶ 12.) Even if Defendant could be said to have been guilty of malpractice because she did not personally examine Plaintiff or failed to make the right diagnosis, malpractice is not enough to establish an Eighth Amendment claim for medical indifference.[9] *Estelle*, 429 U.S. at 105-6 (medical malpractice does not become a constitutional violation "merely because the victim is a prisoner."); *see also Hill v. Curcione*, 657 F.3d 116,123 (2d Cir. 2011) ("Medical malpractice does not rise to the level of a constitutional violation unless the malpractice involves culpable recklessness 'an act or failure to act by [a] prison doctor that evinces a conscious disregard of a substantial risk of serious harm.'") (quoting *Chance*, 143 F.3d

---

[9] Dr. DeAzevedo, who did examine Plaintiff's knee after Plaintiff's transfer to Upstate did not diagnose a torn patellar tendon and concluded that Plaintiff had arthritis. (Dkt. No. 58 at 35.)

at 703). There is no evidence whatsoever suggesting that Defendant engaged in culpable recklessness.

One of the reasons Plaintiff's Second Amended Complaint was able to survive Defendant Northrup's Rule 12(b)(6) motion was that he claimed in his opposition papers that Defendant had failed to "'provide [him] with any type or form of medication for the severe pain he was experiencing.'" (Dkt. No. 43 at 8 quoting Dkt. no. 42 at 4-5.) Plaintiff's medical records, Defendant's Declaration, and Plaintiff's own deposition testimony refute that claim. Plaintiff was given ibuprofen on August 16, 2008, the date of his fall. (Dkt. No. 57-2 at 23-24.) When the ibuprofen ran out, he used the pain killer Fioricet. *Id*. at 30-31. When the Fioricet was taken away from Plaintiff because another inmate had accused Plaintiff of giving some of the medication to him, Plaintiff was authorized to take over-the-counter Motrin or Tylenol. (Dkt. No. 58 at 36.) When Plaintiff asked a nurse for pain medication while he was in SHU, prior to his transfer to Upstate, Plaintiff, by his own admission, was told that he could have ibuprofen. (Dkt. No. 57-2 at 37-39.)

Plaintiff may not have been given pain medication that was as strong as he wanted, but the evidence establishes that pain medication was made available to him for his knee injury. The decision by a health care provider to prescribe one form of pain medication instead of another does not constitute deliberate indifference to an inmate's medical needs. *See Hill*, 657 F.3d at 123 (inmate's claim that he needed stronger pain medication than the Motrin he was given did not state a claim for deliberate indifference); *Harris v. Westchester Cnty. Med. Ctr*., No. 08 Civ. 1128 (RJH), 2011 WL 2637429, at * 3, 2011 U.S. Dist. LEXIS 72566, at * 9 (S.D.N.Y. July 6, 2011) ("The failure to provide stronger pain medication does not constitute deliberate

13

indifference."); *Guarneri v. Wood*, No. 08-CV-792 (TJM/DRH), 2011 WL 4592209, at *13, 2011 U.S. Dist. LEXIS 117129, at * 39-40 (N.D.N.Y. Sept. 2, 2011) (plaintiff's complaints about being given only non-narcotic pain relievers amounts to a disagreement over treatment which is insufficient to allege a constitutional violation); *Wright v. Genovese*, 694 F. Supp. 2d 137, 160 (N.D.N.Y. 2010) ("Differences in opinions between a doctor and an inmate patient as to the appropriate pain medication clearly do not support a claim that the doctor was deliberately indifferent to the inmate's 'serious' medical needs."), *aff'd*, 415 F. App'x 313 (2d Cir. 2011); *Veloz v. New York*, 339 F. Supp. 2d 505, 525 (S.D.N.Y. 2004) (medical provider's decision to provide nothing stronger than Tylenol for inmate's back pain did not constitute deliberate indifference), *aff'd*, 178 F. App'x 39 (2d Cir. 2006).

Finding that Defendant has established through admissible evidence that she did not act with deliberate indifference in treating Plaintiff for his knee injury, and that Plaintiff has failed to produce evidence demonstrating the existence of genuine issues of material fact on the issue, (*Salahuddin*, 467 F.3d at 272-73), the Court recommends that Defendant's motion for summary judgment dismissing Plaintiff's Second Amended Complaint be granted.

**ACCORDINGLY**, it is hereby

**RECOMMENDED** that Defendant Northrup's motion for summary judgment (Dkt. No. 57) be granted; and it is further

**RECOMMENDED** that Plaintiff's Second Amended Complaint (Dkt. No. 37) be dismissed; and it is further

**ORDERED** that the Clerk provide Plaintiff with copies of the unpublished decisions in *Cole v. Artuz*, No. 93 Civ. 5981 (WHP) (JCF), 1999 WL 983876 (S.D.N.Y. Oct. 28, 1999);

*Espinal v. Coughlin*, No. 98 Civ. 2579 (RPP), 2002 WL 10450 (S.D.N.Y. Jan. 2, 2002); *Lowman v. Perlman*, No. 9:06-CV-422 (LEK/RFT), 2008 WL 4104554 (N.D.N.Y. Aug. 29, 2008); *Johnson v. Stempler*, No. Civ.A. 00-711, 2005 WL 119575 (E.D. Pa. Jan. 20, 2005); *Harris v. Westchester Cnty. Med. Ctr.*, No. 08 Civ. 1128 (RJH), 2011 WL 2637429 (S.D.N.Y. July 6, 2011); and *Guarneri v. Wood*, No. 08-CV-792 (TJM/DRH), 2011 WL 4592209 (N.D.N.Y. Sept. 2, 2011) in accordance with the Second Circuit's decision in *LeBron v. Sanders*, 557 F.3d 76 (2d Cir. 2009).

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW**. *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989) (per curiam)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a).

Dated: April 24, 2013
      Syracuse, New York

Thérèse Wiley Dancks
United States Magistrate Judge